MEMORANDUM OF DECISION
This memorandum of decision addresses a petition filed on May 11, 2000, by the Department of Children and Families (DCF) to terminate the parental rights of Nicole J.'s mother, Tammy M., and her father, George J. During the trial of this matter, the respondent father consented to termination of his parental rights. The main issues as to the respondent mother center on the Department's reunification efforts and the respondent's willingness or ability to respond to such efforts. For the reasons stated below, the court finds that, although DCF did not make reasonable efforts to reunify Ms. M. with Nicole, Ms. M. was unwilling or unable to benefit from reunification services. Upon further finding that DCF has proven two adjudicatory grounds for termination of Ms. M.'s parental rights and that terminating both respondents' parental rights is in Nicole's best interest, the court grants the petition and terminates the parental rights of both respondents.
 I — INTRODUCTION
The court finds that the Child Protection Session of the Superior Court for Juvenile Matters has jurisdiction over the pending matter. The court finds that proper service has been made on all parties. No action is CT Page 7692 pending in any other court affecting custody of these children. Both respondents were represented by counsel and appeared personally for trial. The petitioner and minor child were represented by their respective counsel throughout the proceeding.
Trial of the present case was held on ten days from April to November of 2001. During trial the respondent father, George J., knowingly and voluntarily entered his written consent, with the advice and assistance of competent counsel, to termination of his parental rights. After completion of trial transcripts, the parties submitted written briefs and on February 26, 2002, presented oral arguments to the court. The matter was then submitted to the court for decision.
The petitioner called the following as its witnesses at trial:
 • Robert W. Allensworth, program supervisor in the Danbury DCF office;
 • Jesus Martinez, M.S.W., ongoing services worker in DCF's Middletown office;
• Mary Howard, DCF investigator;
 • Dr. Richard Sadler, M.D., a child psychiatrist and the medical director of the children's inpatient psychiatric service at Saint Francis Hospital in Hartford, whom the court appointed to evaluate mother, child, and foster mother in this case and who testified without objection as an expert witness;
 • Ms. Elizabeth Bicio, M.S.W., a licensed psychiatric social worker who works at the Charlotte Hungerford Hospital Center in Torrington and has served as Nicole's therapist at various times;
• April Z., Nicole's foster mother;
• Amanda Z., Nicole's sixteen year-old foster sister;
 • Sherry Hayward, a social worker in DCF's permanency and planning unit, who has been the social worker assigned to this case since November 1999;
 • Claudia DellaBetta, M.S.W., program director and assistant director of Family Services of Waterbury;
• Beth James. M.S.W., a social worker in the adoption and foster care unit at Jewish Family Services in New Haven who has, under CT Page 7693 contract with DCF. met with Nicole monthly: and
• Jim Govoni, a social worker in DCF's Middletown office.
The respondent mother testified and offered three additional witnesses at trial:
• Kevin Real, DCF social worker supervisor;
 • Christine Simeone, M.S.W., who works as a child and adolescent therapist at Middlesex Hospital in Middletown and saw the respondent in therapy there; and
 • Lawrence Byron, M.S.W., a psychiatric social worker at Middlesex Hospital, who has been the respondent's clinician;
In addition, the petitioner and respondent mother both introduced numerous documentary exhibits.
 II — FINDINGS OF FACT[2]
The court has carefully considered the verified petition, all of the evidence, including the social study and other exhibits, and the testimony presented, according to the standards required by law. The court has also taken judicial notice of the contents of the court file and of various proceedings regarding this child before the Superior Court for Juvenile Matters on various dates from March 1994 through the close of evidence here. Upon such consideration, the court finds that the facts recited in this decision were proven by clear and convincing evidence at trial.
A. The respondent mother, Tammy M.
Tammy M., the respondent mother, had a very troubled adolescence and young adult life. Both her father and stepfather physically abused her and her mother. Although her mother has described Ms. M. as having been "indulged" in her childhood, the evidence offered at trial showed that the respondent began showing signs of behavioral problems at a young age. She exhibited uncontrollable behavior and psychological problems that required both outpatient and inpatient treatment. As early as the fifth grade, she was in outpatient treatment at the Charlotte Hungerford Hospital in Torrington because of hysterical screaming and threats when she did not get her way at home. In March 1985, shortly after her 14th
birthday, Tammy's mother filed a family-with-service-needs petition in juvenile court because the respondent was uncontrollable at home. Commitment to DCF did little to control her behavior. Tammy refused to CT Page 7694 attend court hearings, continually acted out in placements at various youth shelters, wandered from one such shelter to another, refused group home placements and extended residential treatment, and exhibited behavior ranging from crying, whining, lies, demands, and temper tantrums. (Pet. ex. 3, pp. 5-6.) A June 1985 psychiatric evaluation described her as "an oppositional youngster who was exhibiting personality traits that were felt to be developing into a personality disorder" and recommended residential treatment that the respondent refused. (Pet. ex. 5 at 3.) The court revoked the family with service needs commitment because the respondent refused a group home placement and her mother requested her return home. In November 1985 she was again transported to Charlotte Hungerford Hospital and briefly hospitalized. By age 16 she had quit high school, been thrown out of her home, become pregnant, and returned home. (Pet. ex. 3, pp. 6-7.)
Between 1988 and 1990 the respondent gave birth to two children. Her first child, Ashley. was born in January 1988 when the respondent was only seventeen years old. Her second child. Amanda. was born in July 1990. By 1992 both had been involuntarily removed from her custody because of her inability to care for them properly. She did not understand that her own behavior was responsible for her loss of custody. (Test. Allensworth, Tr. 4/2/01, pp. 22-23.)
Ms. M. voluntarily relinquished custody of her first child twice in 1988, first to DCF from March 1 through April 6, and then to her sister shortly thereafter. (Pet. ex. 3 at 8.) The Litchfield Probate Court awarded legal guardianship to the sister that October over Tammy's objection. A psychiatric evaluation of the respondent by Dr. David Mantel stated that "mother presents in a psychologically maladjusted fashion with impulsive verbal behavior, excitability, poor social judgment, and an unwillingness to sit for formal psychological evaluations." (Id. at 7.) She lost custody of her second child, Amanda, within two months after this child's birth after a caller reported to the DCF Care Line on August 22, 1990, that the respondent was at Charlotte Hungerford Hospital threatening to kill herself and the baby if someone did not help her care for the infant. An order of temporary custody was granted and Amanda placed in foster care. Another psychiatric evaluation by Dr. Mantel reported that "mother is an immature, oppositional person whose thinking is disordered under stress. She appears to be hypervigilant, having disorganized life patterns, and a dependent personality disorder. Mother shows no insight into the self defeating characteristic of her life pattern and the unproductive and disabling aspects of her decisions." (Pet. ex. 3 at 8.)
Tammy's lifestyle and behavior during this period were chaotic and out-of-control. From 1989 through the end of 1992, she was arrested many CT Page 7695 times for more than 50 criminal offenses ranging from harassment, larceny or bad checks, stalking, criminal trespass, forgery, breach of the peace and similar charges. and convicted of at least eighteen different charges. In late October and early November 1990. homeless. she entered the FISH homeless shelter in Torrington, where she refused to follow shelter rules, do chores, was verbally abusive to staff and residents, and "repeatedly was on the verge of being removed from the shelter." (Id. at 8.) She began living with Nicole's father, George J., at the end of 1990 and began a tumultuous relationship with him characterized by frequent arrests, domestic violence, alcohol abuse, and drug use.
On January 1992, the respondent gave birth to Nicole, the child who is the subject of the present TPR petition. During that year the respondent had many criminal charges pending at various times and was incarcerated several times. Nicole was removed from her care three times. The first incident occurred on March 18, 1992, when she became agitated at the court house, dropped the two-month-old infant, who was in a child carrier, onto a bench from a foot away, and began yelling at court staff. The court, Picket, J., increased her bond on twenty-three then-pending criminal charges, ordered her sent to the women's correctional facility at Niantic, and removed Nicole from her custody on a bench OTC. Upon the respondent's release on bail on April 1, the court, Goldstein, J., vacated the OTC and returned Nicole to her care under protective service intervention. When the respondent was arrested two weeks later and again placed in pretrial detention, DCF obtained a 96-hour hold on Nicole and filed a motion for OTC and petition of neglect in the juvenile court. (Pet. ex. 3 at 10.)
Upon her release from Niantic at the end of June, the respondent was placed on probation after entering guilty pleas to harassment and, for the April courthouse incident, risk of injury to a minor. The juvenile court dismissed the second OTC and again returned Nicole to her care. A condition of her probation was that she participate in a DCF-funded family preservation program that would provide in-home services to help her keep her child safe and improve her parenting skills (tr. 4/2/01 at 48); but in mid-August she was terminated from that program "due to her unwillingness or inability to cooperate with staff." (Pet. ex. 3 at 10.) In October she was again arrested, one of the charges involving another allegation of risk of injury toward Nicole. She remained on bond until additional arrests on November 9 for criminal trespass, breach of peace, stalking, and violation of probation; on November 12, the court, Gill, J., again ordered her detained pretrial and entered a bench OTC. For the third time in less than one year of life, Nicole had been removed from her care. (Pet. ex. 3, pp. 10-11.)
On November 18, 1992, DCF filed co-terminus petitions for neglect and CT Page 7696 termination of parental rights. On June 21, 1993, facing prosecution for 43 criminal offenses (39 counts of harassment in the second degree, two counts criminal trespass in the first degree, one count stalking in the first degree, and one count breach of peace) and numerous counts of violation of probation, the respondent entered guilty pleas in the Superior Court, Geographical Area 18, to four counts of harassment in the second degree, two counts of trespass in the first degree, and multiple counts of violation of probation. The total effective sentence imposed for all charges was six years incarceration, suspended after four years, five years probation. (Pet. ex. 3 and ex. 14.) Later that year, on December 2nd, the court, McWeeny, J., adjudicated Nicole to be neglected and committed her to DCF.
While in prison, the respondent was disciplined several times by correctional authorities for her behavior there. Upon her release from incarceration in 1996, she was on probation but continued to have difficulty conforming her conduct to the requirements of the law. She was arrested again in May 1996 for harassment, detained briefly pretrial, and in March 1997 received a sentence of time served. She was also sentenced to five months in jail for violation of the 1992 probation and received an unconditional discharge for a charge of assault in the third degree, which had been reduced from an original charge of assault on a police officer for a September 1996 incident. In August 1997 she was again arrested, for disorderly conduct, and received a sentence of 90 days suspended and one year probation in November 1997.
Shortly afterward, after respondent's release from incarceration in 1996, she filed a motion in Superior Court, the judicial district of Litchfield, for visitation with Nicole, who was then still living with her father. For reasons not specified by the record, on October 21, 1996, the court, Walsh, J., entered a court order approving a written stipulated agreement between the respondent mother and father that Mr. J. would have sole legal custody and that "visitation shall be suspended for the mother pending further order of the court." (Pet. ex. 22.) The court referred the visitation matter for evaluation by family services.
Ms. M.'s pretrial incarceration for the new arrests slowed the evaluation process, but on April 3, 1997, family relations officer Joseph DiTunno issued a report stating that
Ms. M. has ingrained patterns of behavior which include on-going criminal activity and a poor history of following through with treatment recommendations. . . . [M]other needs to find stability in her life outside of prison and integrate back into the community prior to the start of any endeavor which CT Page 7697 serves to reconnect mother and daughter.
(Pet. ex. 21.) He recommended no contact between Ms. M. and Nicole "until mother engages in a comprehensive psychiatric evaluation." (Id.) On April 28, 1997, the Superior Court, Walsh, J., again adopted a written stipulation of Ms. M. and Mr. J. accepting Mr. DiTunno's recommendations, referring the matter back to family relations for an updated visitation study, and ordering that the respondent mother "will have no contact with the minor child pending" that report. Id. On September 9. 1997. Mr. DiTunno issued a report to the court that Ms. M. had not kept in contact with him, had not engaged in the court-ordered psychiatric evaluation, had been the respondent in a restraining order application granted by the court, and had again been arrested; he concluded that "Ms. M. continues to engage in behavior that causes concern." (Pet. ex. 24.)
Then, rather remarkably, following this long history, for such a young woman, of criminal, disruptive, and unruly behavior, after this last arrest in July 1997 and the November 1997 suspended sentence and probation, Tammy M. stopped getting into trouble with law enforcement authorities. Since then, the record shows no arrests whatsoever. Something clearly happened. She went into therapy. She entered what appears to be a stable relationship. She got a job. She has had two more children whom DCF believes she has done an adequate job of parenting. She explained to Dr. Richard Sadler, the court-appointed psychiatric evaluator in this case, that she had vowed never to have to go back to prison. Dr. Sadler, evaluating her in April 2000, concluded that she had genuinely made changes in her life. Unfortunately for her expressed desire to regain custody of Nicole, however, those changes were insufficient for her to assume care and responsibility for and meet the needs of Nicole, as the court more fully discusses below.
B. The minor child, Nicole
Upon Nicole's birth, her father, George J., did not believe that Nicole was his biological offspring and wanted no contact with the child. After a blood test conducted in September 1993 confirmed his paternity of Nicole, however, he began expressing interest in seeing her and DCF arranged for him to begin visiting Nicole. On March 17, 1994, Nicole was placed in his custody, under an order of protective supervision for six months. The court, Barnett, J., terminated her commitment to DCF. At that point Nicole had been seeing her mother twice monthly at the Niantic women's prison; the court directed Mr. J. to continue such visits during the period of protective supervision but told both him and the mother that after protective supervision ended, such visitation would be at his discretion. See transcripts of proceedings, March 4, 1994; March 17, CT Page 7698 1994. Sometime after the protective supervision ended, at a time not disclosed by the evidence, the respondent father stopped taking Nicole to Niantic to see her mother. She did not then see her mother again until after the court, Trombley, J., ordered visitation resumed in the year 2000.
From 1994 to 1998, Nicole lived with her father, who began a relationship during that period with Ms. Sally G. On April 27, 1998, school authorities reported to DCF that Nicole had come to school with black eyes and abrasions on her face, right forearm, right upper arm and shoulder. Makeup had been applied to the face in an attempt to conceal the bruises. A DCF investigator went to the school, observed her to be bruised on her face, neck, arms and upper torso, and interviewed her. Nicole readily told the investigator that her father and Sally had struck and pushed her. A doctor who examined Nicole the next day at the Charlotte Hungerford Hospital emergency room told DCF that the bruises were consistent with her story of having been grabbed around her throat and thrown to the ground. (Pet. ex. 3 at 25; ex. 13.) Photographs of Nicole and the injuries to her introduced into evidence by the petitioner showed multiple bruises on a sad and frightened child. (Pet. ex. 13.) DCF removed Nicole from her home on a 96-hour hold and obtained an OTC on April 30, 1998, which, on May 6, 1998, the court. Swienton, J., ordered to remain in effect by agreement of both parents.
The injuries Nicole had exhibited were not isolated injuries. Her father and stepmother had repeatedly physically abused her — using excessive physical force while disciplining her, striking her with their hands, spoons, and a garden hose, punching her in her vaginal area, and forcing her to eat horseradish and hot peppers. (Pet. ex. 3 at 26, tr. 4/3/01, pp. 120-122.) Police arrested both Mr. J. and Ms. G. for abusing Nicole. Eventually, her father pleaded guilty to multiple charges and received a sentence of four years, suspended after fifteen months, and three years probation. (Pet. ex. 1 at 7; and ex. 15.)[3]
When removed from her father's home on April 27, 1998, Nicole found herself, at age six, in foster care for the fourth time in her short life. For most of Nicole's life, she had been cared for by her father, who had betrayed and repeatedly physically abused her. Neglected numerous times in her early development by her mother (tr. 4/2/01 at 105), Nicole had no memory of, or attachment to, or relationship with her mother whom she had not seen for several years and who had not cared for Nicole since the child was less than a year old. (Resp. ex. C.) Nicole told her therapist, Liz Bicio that meeting Ms. M. "would be like meeting a stranger." (Tr. 4/4/01 at 3.)
Although very sad and upset about having been abused by her father, CT Page 7699 Nicole quickly developed a close relationship with the foster parents with whom DCF placed her. She was very clingy to both the foster mother and father and would get upset if apart from them. The abuse and abandonment she had suffered had left her extremely fragile; Nicole was confused, angry, anxious, fearful and needed to be made secure. (See e.g., test. Howard, tr. 4/2/01, pp. 80, 88; test. Bicio, tr. 4/3/01, pp. 119-120.) She had temper tantrums, acted out sexually, (tr. 4/3/01, pp. 89-90), had nightmares, and exhibited a labile mood that ranged form cheerful to angry. (Tr. 6/4/01, p. 44; tr. 7/24/01, p. 71.) One time, when her foster mother put on a belt while dressing, Nicole became terrified, and hid in the bathroom while saying that she was afraid her foster mother would hit her with the belt. (Pet. ex. 3 at 25.)
DCF referred Nicole for therapy to help her deal with the emotional and behavioral problems she was experiencing. She began seeing Elizabeth Bicio, a licensed clinical social worker and therapist at Charlotte Hungerford Hospital. In those sessions Nicole was open and talkative about her feelings and discussed the repeated physical abuse she had suffered, her desire not to have any visits with her father or stepmother, her fear they would hurt her again, and many other emotional issues. The sessions with Ms. Bicio increased Nicole's anger, however, and her behavior in the foster home would become uncontrollable afterwards. Therapy sessions increased to three times a week. When Nicole began acting out sexually in the foster home and inappropriately touched a younger foster sibling, that foster family asked that she be removed. On July 2, 1998, DCF then placed her in the Waterbury home of April Z., where she has remained since. After that move, DCF transferred her therapy to the Waterbury child guidance clinic, where she saw Jennifer Rusk, an intern therapist there, until Ms. Rusk went on maternity leave the following spring, when DCF referred her back for more sessions with Bicio, whom she continued to see until the end of 1999.
After the move to the second foster home, Nicole initially continued to exhibit emotional and behavioral problems. She was withdrawn, wet her bed, had nightmares, argued or cried a lot, and threw temper tantrums. Within a short while, however, she began to adjust to the new foster home and both her behavior and emotional state improved significantly. The nightmares and temper tantrums subsided. In a January 1999 psychiatric evaluation with Dr. Sadler, she showed no sign of unusual anxiety or sadness. He concluded that "Nicole demonstrates the advanced social skills suggesting a positive coping response to greater than ordinary stresses during her development." (Pet. ex. 6 at 8.) By mid-1999, she was functioning well in her foster family and doing well academically and socially at school, all of which showed "important and powerful indications of Nicole's ongoing, positive and complex personal strengths and abilities." (Pet. ex. 7 at 1.) CT Page 7700
In a follow-up evaluation with Dr. Sadler in April 2000, Nicole was still functioning "well" in her day to day life and "showing . . . rather ordinary reactions to difficult circumstances, as well as just ordinary difficulties of every day life." (Tr. 4/2/01 at 112.) Placed "in a foster home that had allowed her to develop remarkably well[,] [s]he had undergone significant changes while living with her foster mother." Id. at 100. Dr. Sadler credibly found that:
 Nicole is functioning at this time in a surprisingly functional, emotionally aware and intellectually competent manner. Nicole gives every indication of possessing an unusual awareness, for her age, of the events around her. Nicole gives every indication of an unusual awareness of the significance of these events and an ability to recognize them both emotionally and intellectually. Nicole appears to be thriving in her current foster home. She has formed meaningful attachments and she appears to experience ordinary difficulties with her foster siblings which simply adds meaning and weight and complexity to the importance of Nicole's experiences in this foster home.
 Nicole does not, at this time in this evaluation, show any emotional or psychiatric indication of the traumas which she has experienced. She does not give indications of anxiety or impaired emotional abilities or disturbed interpersonal relationships. Nicole shows, as the only indication of the extraordinary disruptions which she has endured through her lifetime, an unusual intellectual and interpersonal maturity while she is still able to show the interests and emotions of an eight year old. Part of Nicole's personal appeal is, in my opinion, actually a developmental distortion resulting from her traumas that for Nicole appears to be functional, constructive and useful. The negative effects of the disruptions and traumas to Nicole, while not preventable, appear to be dealt with by Nicole by a continual emotional and intellectual reworking as she grows and develops and continually reworks and reassesses the meanings of these experiences.
(Pet. ex. 8, pp. 14-15.) CT Page 7701
Despite Nicole's success in the Z. foster home, in mid-2000 DCF began planning to move her elsewhere. DCF believed that Ms. Z. was resistant to Nicole's therapy, interfered in the child's therapeutic relationship, did not understand interpersonal boundaries adequately, lacked the ability to act in Nicole's best emotional interest, discouraged or sabotaged Nicole's trust of other adults in her life, and provided a home with the potential for disruption and instability. Moreover, Ms. Z. had stated she would not adopt Nicole. (Pet. ex. 9, pp. 3-4.) Dr. Sadler again evaluated Nicole, this time including an interactional session with Ms. Z., and also evaluated Ms. Z. He strongly disagreed with DCF's assessments of Ms. Z. He concluded that
 Ms. Z. has remarkably successfully cared for Nicole for over two years, during which time Nicole has undergone numerous major stresses and during which time Nicole has continued to grow intellectually, academically and interpersonally. . . .
 [Ms. Z.'s] behaviors . . . appear to have resulted in Nicole's thriving while in her care. The results of Ms. Z.'s care of Nicole have been unexpectedly positive. . . . The relationship between April Z. and Nicole J. is a relationship that is functioning quite well. Their relationship is seen to be that of a mother and daughter. . . . No clear indication of Ms. Z.'s acting in any way that is not in Nicole's best interest . . . was identified.
(Pet. Ex. 9, pp. 8. 13.) DCF abandoned its plans to move Nicole from the Z. home, and Ms. Z. began discussing the possibility of adopting Nicole.
As the above paragraphs make clear, Nicole has had extraordinary success during the last four years in recovering from the physical abuse and emotional trauma she had suffered. In the Z. foster home, she has developed remarkably well and undergone significant emotional changes for the positive. Nicole has developed a "normal . . . mother/child relationship" with her foster mother, April Z. (Tr. 6/6/01 at 48; tr. 6/4/01 at 37; pet. ex. 9 at 13.) April has become Nicole's psychological parent and they share a "functional, loving, bonded, and highly successful relationship." (Pet. ex. 9 at 14.) No longer appearing fragile, she now seems precocious and resilient. No longer a frightened and angry child, she appears happy and bubbly. She is doing advanced school work, involved in many activities, and gets along well with her peers.
Yet she still has many issues to work on. Like any child, Nicole needs a stable, loving home and a sense of permanency. Abandoned by her mother CT Page 7702 as an infant, physically and emotionally abused by her father, she also has many special needs. Despite her progress to date, advanced intellectual abilities, and good social skills, it is likely that she will "develop, multiple serious and deep-seated emotional conditions that will affect her development for the rest of her life." (Pet. ex. 8 at 16.) One of her coping strategies is that she wants to please people. She is a child who needs a substantial amount of praise and encouragement and seeks it out. (Tr. 6/5/01 at 145.) She wants no conflict around her and likes it where nobody is upset of confused. She gets upset when her life becomes uncertain.
Sometimes Nicole cries because of being upset about not knowing what is going to happen to her and where she will grow up. (Test. James, tr. 6/6/01 at 51.) This uncertainty about where she is going to live has "had a great impact on Nicole . . . creating a lot of anxiety. a lot of uncertainty [, and] . . . a lot of defensiveness." (Test. Bicio, tr. 4/4/01 at 2.) That defensiveness is particularly important in considering Nicole's needs and future. As Dr. Sadler described her, not only is Nicole intelligent; but she is also hyper-vigilant and very aware of what is going on around her; an example is her recognition, when not yet ten years old, that the purpose of therapy was not just to help her, but equally as much to provide DCF and the court with information about her. (Tr. 4/3/01 at p. 128; tr. 4/4/01, pp. 11, 22, 23, 45, 46.) As a result, Nicole is now hesitant to provide DCF or her therapist with accurate information about what is happening to her. As her DCF social worker described:
 Nicole has become more and more shut down in terms of wanting to talk with providers about how she feels about anything. In the past so many things she said . . . have gotten back to the Courts [and] to DCF. She just doesn't trust. . . . It's very difficult being providers working with her because although you need to how she's feeling and stuff, she does not want to talk about any of this anymore. She wants things to be resolved. She's sick of it, and she's sick of this limbo that she's living in.
(Test. Hayward, tr. 6/4/01 at 81.) The disruption and lack of permanency in her life have left her upset about her past instability, anxious about her future, and contributed to her guardedness, so much so that her therapist, Liz Bicio, is concerned that she would not disclose abuse inflicted on her again. This resistance to disclosure heightens the need for Nicole to be in a safe and stable home.[4]
Although Nicole may be more stable now than most abused children, and CT Page 7703 act out less, she still "feels unstable." (Tr. 6/6/01 at 53.) Years of impermanence have left her "confused . . . [,] upset . . . [and] hurt." (Id. at 53.) At the age often, after so many years of uncertainty, Nicole urgently needs a stable and permanent home. (Pet. ex. 6, 8, 9; tr. 6/6/01 at 53.) She also needs a parent who can provide the stability that she requires. (Id. at 53-54.) She still harbors many feelings about being abused by her father, and will probably need therapy at various times in her life. Intelligent and inquisitive about her past (tr. 6/6/01 at p. 42), Nicole needs a parent attuned to her unique needs (tr. 6/5/01 at 164; tr. 6/6/01 at 32), one who can understand the full extent of what she has been through (tr. 6/4/01 at 80; tr. 6/6/01 at 54) and give her honest, thoughtful answers about her history. Insight into Nicole and her feelings will become even more important as she gets older. (Test. James, tr. 6/6/01 at 54.) As she approaches and enters the adolescent years, she will need a parent "who can understand what she has been through so far and can help her keep that in the right perspective. . . . It's going to take somebody who really understands what has happened to Nicole." Id.
III — ADJUDICATORY DECISION
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. The burden of proof in both phases is clear and convincing evidence. In the adjudicatory phase of the proceeding, the court must make separate determinations as to reasonable efforts and statutory grounds for termination. "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a). DCF filed the TPR petition on May 11, 2000. On September 13, 2000, the court, Trombley, J., granted in part a request to revise of the respondent mother by ordering excision from the "Summary of Adjudicatory Facts for Termination of Parental Rights." Since the court's order had the effect of amending the petition, the adjudicatory date is thus September 13, 2000.
A. Reasonable Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it
has made reasonable efforts to locate the parent and to reunify the child with the parent. unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has CT Page 7704 determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate, . . . .
General Statutes § 17a-112 (j)(1). DCF may satisfy its obligations under this subsection in one of three ways — (1) proving by clear and convincing evidence in the TPR trial that it made reasonable efforts to locate the parent and reunify parent and child; (2) proving by clear and convincing evidence in the TPR trial that the parent was unwilling or unable to benefit from reunification efforts; or (3) establishing to the satisfaction of the juvenile court at a pretrial hearing pursuant §17a-110 (b) or § 17a-111b that such efforts are not appropriate. The latter is not relevant here, as the juvenile court in prior proceedings declined to make such a finding. DCF alleges in the petition here both that it made reasonable efforts to reunify Ms. M. with Nicole and that she was unwilling or unable to benefit from reunification efforts. Proving the latter obviates the need to allege or prove the former, for § 17a-112 (j)(1) does not require a finding of reasonable efforts if the court finds that the parent is unable or unwilling to benefit from reunification efforts.
The reasonable efforts determination is part of the adjudicatory decision. In Re Tabitha T., 51 Conn. App. 595, 599, 722 A.2d 1232 (1999) ("As part of the adjudication process, § 17a-112 (c)(1) requires that the court find by clear and convincing evidence that `the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . .'") This court is therefore limited, in assessing the reasonableness of location and reunification efforts, to considering facts occurring before filing of the TPR petition or any amendments to that petition.
Since the purpose of reunification services is to assist the parent in becoming a fit custodian of her child. the court must assess the reasonableness of the services provided by DCF in light of, among other factors, the parent's problems that led to the child's removal and the child's age and needs.
1. The reasonableness of reunification efforts
The reasonableness of DCF's reunification efforts here is hotly contested. DCF claims that it offered the respondent "numerous services" in "the many years that DCF has been involved with" her. (Pet. brief at 13.) It further claims that in the years after Nicole's return to foster care in 1998, "DCF workers again did all they could to assist Ms. M. to CT Page 7705 rehabilitate to parent Nicole." Id. Much of the dispute over the reasonableness of reunification efforts here centers upon Ms. M.'s continuing efforts, since her release from Niantic in 1996, to begin seeing Nicole and DCF's active resistance to those efforts. The respondent mother claims that DCF's active effort to prevent her from visiting Nicole created an "untrue barrier" and violated the statutory mandate of reasonable efforts to reunify. (Resp. brief at 14.)
The crux of the dispute over visitation here centers on the 1996 Superior Court order preventing Ms. M. from having any contact with Nicole until the respondent had a psychiatric evaluation. After Nicole's removal from her father, although Ms. M. continually requested visitation, DCF repeatedly told Ms. M. that she first had to get the court order lifted or changed, and referred her back to the family division of Superior Court for a modification of that order (Test. Howard, tr. 4/2/01, pp. 76, 78), as DCF social worker Sherry Hayward acknowledged at trial:
 Q. You testified earlier that DCF. either yourself or a previous worker, told Ms. M. and her attorney if you want visitation, you have to get that order lifted. Do you remember that?
A. Yes
 Q. Okay. Did you tell her or her attorney that she had to do anything else?
 A. She needed to go to Litchfield Court and get the Court Order lifted.
(Test of Hayward, tr. 6/5/01 at 86.)
Yet in Juvenile Court proceedings on July 1, 1998,[5] the court,Swienton, J., had already directed that the family division file be transferred to Juvenile Court and had ordered a psychiatric evaluation of the respondent mother. (Tr. 7/1/98, pp. 13 — 16.) At the next juvenile court proceeding, on September 9, 1998, the court confirmed that it now had the family division file; DCF counsel told the court that DCF was not opposing visitation because of the existing family court order but wanted to see the results of the upcoming evaluation before determining its position on visitation.[6]
At the request of the respondent's counsel, the court ordered DCF "to explore the issue of visitation" but also expressly stated in the presence of the DCF social worker, the respondent, and respondent's CT Page 7706 counsel that no visitation would occur without an order from the court: "there's going to have to be a letter in front of this Court from the therapist saying that it's okay to change that rule or that order." (Tr. 9/9/98, pp. 10-11.) At various other times in subsequent proceedings before the juvenile court, it was clear both that the juvenile court had possession of the family division file, had assumed exclusive judicial jurisdiction over the visitation question, and that the court had ordered no visitation between Ms. M. and Nicole with out express court approval. Ms. M.'s attorney continued to advocate before the juvenile court for the lifting or modification of that order. Eventually, Judge Trombley ordered visitation, which then began on a weekly basis.
What is clear from this review of the past proceedings is that DCF gave the respondent incorrect information when it repeatedly advised her that the barrier to visitation was the Litchfield family court order prohibiting contact and that she had to go back to that court to get that order lifted. Yet it is also equally clear that providing that incorrect information was of absolutely no consequence here — i.e., was completely harmless. Even before Nicole had been adjudicated neglected, the juvenile court had assumed sole jurisdiction over whether Ms. M. could visit with her, and both the respondent and her attorney knew that to be so. The psychiatric evaluation that was the precondition for further contact with Nicole had been completed by October 1998.
Noting that her earlier history of judgment and personality impairments had in the past seriously impaired her parenting abilities of her three oldest children, that psychiatric evaluation in October 1998 by Dr. Sadler recommended against resuming a parent-child relationship between the respondent and Nicole because of Ms. M.'s failure to understand her problems and their effect on her children. When Dr. Sadler's evaluation concluded that resuming contact between Ms. M. was not in Nicole's best interest, DCF took no further steps to explore visitation and awaited the results of the respondent's administrative and judicial efforts to obtain visits. Even though DCF workers misled the respondent when telling her to go back to Litchfield Superior Court. that erroneous advice had no effect here, because her own attorney was pursuing visitation in the proper forum, before the juvenile court. Under the juvenile court's order, moreover, DCF lacked authority to resume visitation without judicial permission. When later ordered by the court to explore visitation, DCF complied and asked Nicole's therapist, Liz Bicio, to consider whether contact should be resumed. Bicio wrote DCF that
It is not in the interest of this child for visitation or contact to occur with biological mother unless there is a definite plan for reunification. Continued contact without plan for reunification will exacerbate CT Page 7707 this child's attachment problems.
(Resp. ex. C.)
Dr. Sadler advised DCF that therapy would be an appropriate forum where the respondent could begin addressing her lack of insight. Yet, although DCF told the respondent several times that she needed to "start . . . talking about . . . some of the issues that led to Nicole's removal and what her responsibility was" for Nicole's present plight (Test. Hayward, 6/4/01 at 70), DCF refused to tell her therapists about the department's concerns. DCF took the position that it lacked authority to disclose its concerns since they were based on Dr. Sadler's reports, which had resulted from court-ordered evaluations and hence, DCF maintained, could only be disclosed by court order. Accordingly, DCF wrote the respondent's therapist that the respondent's attorney would have "to file a motion with the court to have the report released" to the therapist. (Pet. ex. 35.) It sent a copy of that letter to the respondent's counsel.
The law on reasonable efforts makes clear that DCF is under the obligation to make reasonable efforts, not every effort, or even a perfect effort, to reunify parent and child. "Although `[n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible.'" (Internal quotation marks omitted.) In Re Mariah S., 61 Conn. App. 248,255, 763 A.2d 71 (2000). In determining the reasonableness of services, the court must consider both the parent's history and the totality of services provided by DCF. See, e.g., In re Daniel C., 63 Conn. App. 339,362-363, 776 A.2d 487 (2001). There is no definitive list of what constitutes reasonable efforts. No specific service is necessarily reasonable or unreasonable. Reasonable reunification efforts is a child-specific, parent-specific standard dependent on the specific factual situation of each case. The ultimate parameter is that of reasonableness.
The standard of proof, moreover, is clear and convincing evidence, a term that denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they CT Page 7708 are false or do not exist.
(Internal quotation marks omitted.) Wildwood Associates, Ltd. v.Esposito, 211 Conn. 36, 42, 557 A.2d 1241 (1989). "The burden of persuasion, therefore, in those cases requiring a showing of clear and convincing proof is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." Daceyv. Conn. Bar Association, 170 Conn. 520, 537 (1976).
In the present case, the court concludes that the evidence falls short of the clear and convincing standard of proof — not because of DCF's failure to allow visitation, however, for the juvenile court reserved that decision to itself nor because of DCF's incorrect advice to the respondent that she had to seek modification of the no-contact order from Litchfield Superior Court, for both the respondent and her lawyer knew that the juvenile court had assumed exclusive jurisdiction over the visitation question, were trying to modify that order there, and expended no wasted effort seeking a modification of the order from the family division. Hence, as discussed above, this incorrect advice was completely harmless and inconsequential. What fails to meet the clear and convincing burden of proof as to reasonable efforts is the inadequacy of DCF's efforts to offer Ms. M., or ensure that she had access to, services that would help her address her need for insight into Nicole's problems and her responsibility for those problems.
From 1997 on, Ms. M. was participating in therapy that she had sought on her own. DCF knew that she was in therapy, knew that Nicole needed a parent who could understand and help the child deal with her history, and knew that the respondent needed to work on developing such insight. The respondent's therapist did not provide insight-oriented therapy, but attempted to help Ms. M. control her impulsive behavior and develop adequate daily parenting and living skills. When her therapist sought DCF's advice or direction about the issues it wanted her to work on, DCF declined to provide that information, and claimed it could not do so because its views derived from a confidential court-ordered psychiatric evaluation.[7] The department instead advised the therapist to ask the respondent's counsel for court permission to disclose that report.
DCF social workers did tell the respondent herself the issues on which she needed to work, including their belief that she needed to work on developing insight into and a sense of responsibility for Nicole's past. Yet both these actions — telling the respondent what she needed to work on and advising the therapist to ask the respondent's counsel to obtain a court release of Dr. Sadler's report — in effect evaded CT Page 7709 DCF's independent and statutory responsibility to offer services that would help the respondent address her parenting problems and instead placed the entire responsibility for obtaining those services on the respondent.
When the therapist sought advice from DCF on what issues it wanted the respondent to work on, DCF had various options. It could have disclosed those issues, but chose not to, apparently based on legal advice from its counsel. (Tr. 6/5/01, pp. 98-99, and 101)[8] Even if that position was correct, however, nothing prevented DCF from seeking release of that information from the court. DCF also could have it offered the respondent other therapy with a DCF-authorized provider to whom it could disclose this information and who would thus know and be able to work on the relevant parenting issues with the respondent. Failure to do either of these fell short of DCF's reasonable efforts obligation to provide services reasonably calculated to help a respondent parent address the problems hindering reunification.
In this particular case, DCF had information that in many ways the respondent had made remarkable progress from her previous lawless and uncontrollable ways. She had not been arrested in several years, was holding a steady good job, and was raising two children in a home environment that the local Middletown DCF office had investigated and found not to warrant DCF intervention. (Although the Waterbury office of DCF that was handling Nicole's case had some concerns about the adequacy and stability of the respondent's home environment and whether there was any domestic violence in her household, the Middletown office had concluded, after an investigation and monitoring, that there was no justification for such concerns.) The court-appointed evaluator, Dr. Sadler, had concluded that the respondent was capable of meeting Nicole's day-to-day physical needs.
Under these circumstances, the primary obstacle to the respondent's reunification with Nicole was the respondent's longstanding lack of insight or sense of responsibility for Nicole's past. Under these circumstances, DCF's statutory obligation to make reasonable reunification efforts obliged it to offer the respondent services that, if successfully utilized by the respondent, would offer her the means to address that lack of insight. Simply telling a person who lacks insight, and does not perceive the need for such insight, that she must gain insight, as DCF did here, does not meet that responsibility. Telling the individual's therapist and attorney that DCF could not disclose its concerns to the therapist and that the respondent's attorney must obtain court permission to do so did not fulfill DCF's independent obligation to provide reasonable reunification services. If DCF had to conceal the necessary treatment goals from the respondent's therapist, then DCF CT Page 7710 itself had to provide a service directed toward those goals. The court thus concludes that the evidence here does not establish by the clear and convincing proof that DCF made reasonable reunification efforts.
2. Unwilling or unable to benefit
While DCF may not have made reasonable efforts at reunification, the evidence also establishes clearly and convincingly that the respondent mother was — as of the time that DCF filed the petition on May 11, 2000, when the court ordered the petition amended on September 13, 2000, and at the time of trial — unwilling or unable to benefit from reunification efforts. The court bases this finding on a consistent variety of evidence offered at trial, including the expert opinion of Dr. Sadler, confirmed by evaluations of other mental health professionals contained in the record, that the respondent lacks the ability to gain the insight needed to parent Nicole adequately; the opinion of the respondent's own therapist that although the respondent had made progress in controlling her impulsive behavior, she was limited in her insight; the credible testimony from DCF social workers and other social service personnel who observed during the respondent's visits with Nicole that the respondent, despite admonitions that she needed to gain insight into Nicole's needs, failed to do so; and the totality of the evidence offered at trial.
Dr. Richard Sadler performed two different psychiatric evaluations of the respondent, the first time in October 1998 and the second time in April 2000. On both occasions, she showed herself unable to understand her own problems and impairments, the reasons for the removal from her care of Nicole or her first two children, or her own continuing need for services. Both times Dr. Sadler credibly concluded that she then lacked, and would probably always lack, the necessary insight into herself or Nicole's history to provide proper care for Nicole.
In the October 1998 evaluation, Ms. M. minimized the reasons why Nicole or her two oldest children were removed from her care. She showed no understanding of her own impairments and even stated that she saw no problems in her own care of Nicole,[9] despite the fact that DCF removed Nicole from her three times. She described the problems of her early life as resulting from immaturity or shyness without mentioning her difficulties with the law or incarceration.[10] She saw no "need for support services or treatment services because she [did] not see herself as experiencing any emotional, interpersonal, behavioral or judgment impairments." (Pet. ex. 5 at 20.) Her failure to understand her responsibility for the termination of her parental rights to her two oldest children and for Nicole's removal from her care legitimately caused Dr. Sadler, as it does this court, to worry about her ability to CT Page 7711 care for Nicole in the future. As Dr. Sadler credibly explained at trial:
 [I]n order to care for a child, one of the very important aspects is feeling responsible for the child, to watch them, to make the judgments necessary, and if Ms. M. did not feel responsible for Nicole being removed, I would be concerned about her feeling responsible for caring for her in the future. . . . [I]t is a way to identify that a parent is thinking about what happened, and has begun to at least intellectually address what a parent needs to do, what are the important issues, what to think about with the child. . . . And through 1998, Ms. M. was not able to say I have some ideas about what I wish I had done back then, and how I would do it differently now. . . . [T]he best way I know to see how she might handle Nicole in the future is to ask her what she would do and what she wished she had done before.
(Tr. 4/2/01, pp. 159-160.)
Dr. Sadler thus concluded in 1998 that "Ms. M. is not demonstrating sufficient understanding of her own impairments to recommend that an attempted resumption of the parent-child relationship would be in Nicole's best interests." (Pet. ex. 5 at 21.)[11] When he evaluated her again in April 2000, he noted that she had accomplished some psychological progress and appeared "to be functioning currently in the best and most stable manner which she has achieved over her entire adult lifetime." (Pet. ex. 8 at 15.) She still, however, minimized her responsibility for Nicole's removal from her care: "her understanding about Nicole had not changed . . . She did not understand better why Nicole was not living with her, why she lost custody of Nicole, and she had not made progress with understanding herself in that relationship." (Test. Dr. Sadler, tr. 4/2/01 at 105.) She still lacked any insight "into her own impaired functioning either currently or in the past." (Pet. ex. 8 at 12.) Nor could she yet could describe her own parenting deficits or errors in judgment, or identify any neglect or failure on her part to care for Nicole.[12] She was, he concluded
exceedingly limited in her ability to understand and to facilitate her daughter's understanding of her own personal disruptions and emotional vulnerabilities. . . . Ms. M. . . . continues to show such serious impairments in her ability to deal with Nicole's past abuses and neglects that I do not believe, in my best CT Page 7712 judgment, that she would ever be able to meet Nicole's needs for basic emotional understanding and guidance. I do not believe there is any chance whatsoever that Ms. M. could meet Nicole's specialized emotional needs.
(Id. at 17.)
The effect of Dr. Sadler's conclusions is that, because of her limited ability to understand and gain insight, the respondent would never have the capacity to gain the level of insight about her responsibility for Nicole's plight or Nicole's needs as to ever be able to meet those needs. As with any expert, the court was free to accept or reject his testimony and conclusions[13], and the court here found the detail and quality of his comments and reports, their consistency with the other evidence, and their congruity with the court's own observations of the respondent to be logical, cogent, and persuasive.
Two other evaluators had earlier in Ms. M.'s life arrived at similar conclusions about her lack of insight. Dr. David Mantell conducted at least two court-ordered psychological evaluations of her, in 1989 and 1990, and found her to have no insight into the nature of her impaired functioning, "the self defeating characteristic of her life patterns and the unproductive and disabling aspects of her decisions." (Pet. ex. 3 at 8; ex. 5 at 3.) In February 1993, Dr. Barbara Berkowitz, Ph.D., conducted another court-ordered psychological evaluation of Ms. M. and similarly reported that
 Mother appears to be unable to accept responsibility for any of what has befallen her, or to make any insightful connections among any of the actions that led to the Termination of her Parental Rights with either of her two daughters. As in other circumstances, mother seems to have great difficulty understanding and accepting anything that is not in accordance with her expressed wishes and needs. Mother's impulsive and defensive response style keeps her from taking responsibility for her own behaviors and it's [sic] consequences.
(Pet. ex. 3 at 11; ex. 5 at 4.) The conclusions of Doctors Sadler, Mantell, and Berkowitz are consistent with the testimony at trial of the respondent's former therapist, Christine Simeone, who testified that Ms. M.'s therapeutic work dealing with issues from her past was "not at the level of insight." (Tr. 6/6/01 at 127.) Simeone also agreed that on some of the issues they had worked on, Ms. M. "just didn't get it." (Id., pp. CT Page 7713 128-129.)
Moreover, despite the fact that DCF social workers repeatedly told her that she needed to work on developing insight, she never identified that as a goal for her therapy. With Simeone, whom she saw twice at the Middlesex Memorial Hospital, from March to November 1998 and from July to September 1999, the goals she stated for therapy were to make changes in her life to avoid ever again being incarcerated, to handle her emotions and impulse control more appropriately so she would not lose custody of children then in her care, and to improve her self-esteem and develop better parenting skills. (Id. pp. 98-99, 107.) From October 2000 on she was in therapy with another Middlesex Hospital social worker, Larry Byron, and the goals she stated for her therapy were to deal with the symptoms of anxiety and depression. (Tr. 7/24/01 at 5.) During her own testimony, the respondent herself insisted, implausibly and incredibly, that DCF never gave her any goals to work on in her therapy.[14]
The evidence as a whole, moreover, also shows that the respondent functions in life, as her former therapist Christine Simeone stated, at a concrete, practical level rather than by developing insight and understanding:
 Ms. Simeone: Ms. M.'s thought processes tended to be on a more cause and effect on concrete level.
Q: What do you mean by that.
 A: You sort of see things for what they are, and you make a decision. You don't take a whole lot of time to consider other possibilities or look at other possible ramifications or philosophies about your decision making. More straight forward.
(Tr. 6/6/01 at 120.) The testimony of staff from Family Services of Waterbury, which has provided the site and supervision for the respondent's visits with Nicole since those visits resumed by court order in August 2000, provided other examples of the respondent's lack of insight into Nicole's needs. Although program staff there would meet with Ms. M. after each visitation to review it and give her suggestions, the respondent was not receptive to the advice and sometimes even resisted the feedback she would receive from the staff supervising those visits. The respondent did not perceive Nicole's need for praise and CT Page 7714 encouragement and instead sometimes competed with her daughter, rather than being supportive. She would not recognize how her conduct would affect Nicole, although she did show the capacity, over time, to modify her behavior somewhat based on feedback.
Ms. M.'s inability to benefit from counseling is also demonstrated by her failure to address Nicole's needs or to build a relationship with Nicole in therapy. Ms. M. never showed any understanding that counseling was an opportunity for her to address her problematic relationship with Nicole or Nicole's needs. Although one of her ostensible goals in her first sessions with Christine Simeone was to develop parenting skills, Ms. M. did not focus on Nicole's needs or how to meet them, and their second sessions focused on building self-esteem. Her later therapy sessions with Larry Byron did not focus on parenting Nicole or meeting the child's needs. Moreover, she gained little insight into appropriate parenting from her participation in the Family Advocacy Program at Middlesex Hospital. The counselor there reported to DCF that "she did attend but that they felt that she did not really want to discuss anything about parenting." (Tr. 4/2/01, pp. 83-84.) Ms. M. did not complete the Magic 1, 2, 3 parenting program with Ms. Simeone. (Tr. 6/6/01, pp. 104, 107, 130.)
Functioning, as her therapist said, at a concrete level, repeatedly failing to show insight into her own or Nicole's past, or her responsibility for Nicole's past, refusing to tell her therapists that DCF had told her she needed to work on gaining insight into those issues, the respondent has consistently been unwilling or unable to seek or gain the insight that Nicole needs from her parent. Despite the failure of DCF to offer or ensure that the respondent received insight-oriented therapy, the respondent was nonetheless unwilling or unable to benefit from such therapy, and offering it would have been a futile endeavor. The law on reunification efforts establishes a standard of reasonableness, and hence does not require the Department to provide reunification services to a respondent who is unwilling or unable to benefit from such services. "[T]the law does not require a useless and futile act." In re Antony B., 54 Conn. App. 463, 476, 735 A.2d 893
(1999). Here, with the respondent mother unable or unwilling to benefit from insight-oriented therapy, or to gain insight, such therapy would have been futile and the statute thereby relieves DCF of the responsibility to offer that service.
The evidence as a whole, moreover, repeatedly shows the lack of willingness or ability of Ms. M. to benefit from reunification services.In re Savanna M., 55 Conn. App. at 813. Ms. M. has often responded to the services provided to her by DCF with hostility. DCF social workers testified at trial, for example. how Ms. M. often made providing CT Page 7715 case-management services exceedingly difficult. During the 1991-1994 period, her DCF social worker Robert Allensworth, often found it impossible to have a constructive conversation with Ms. M. She would be "irate and angry and out of control" (Tr. 4/2/01 at 51.) After her release from prison, Ms. M. would often "hang up on me or she would yell" at her then social worker Mary Howard when discussing services. (Tr. 4/2/01, pp. 76, 85.) Ms. M. was aware that the court had ordered her to keep all appointments set by DCF (see pet. ex. 4A; tr. 7/24/01 at 87), and DCF's requests for home visits certainly qualify as efforts by DCF to set appointments; yet DCF social worker Sherry Hayward unsuccessfully tried approximately fourteen times to schedule a home visit with Ms. M. to no avail. (Pet. ex. 27, 28, 29, 30; tr. 6/4/01 at 65.) As late as August 2001, Ms. M. hung up twice on Social Worker Supervisor Kevin Real rather than resolve a visitation schedule. (Pet. ex. 42.) Thus, despite being directed to improve her impulse control (tr. 4/2/01 at 80) and even working on doing so in counseling, Ms. M. was unwilling or unable to improve her working relationship with DCF even when the agency did provide reunification services. in a dramatic illustration of her continuing inability to control her impulses, Ms. M. made an unprovoked profane gesture to Nicole's sixteen-year-old foster sister in March 2001.[15]
As DCF correctly notes in its trial brief, it is "almost impossible to help someone who denies any impairment." Yet the evidence shows that Ms. M. has continually done so with regard to her ability to meet Nicole's needs. As discussed above, she was not candid with Dr. Sadler, instead painting a rosy picture of her past. She denied any problems in her own care of Nicole. When interviewed by him in April 2000, she could not, even after several years of therapy and having been repeatedly advised by DCF that she needed to understand and accept her responsibility for Nicole's past, acknowledge any "emotional or developmental problem that her own history . . . would bring to her relationship with her daughter. . . . [,] describe her own parenting deficits or her own errors in judgment . . . [or] identify her neglect of and failure to care for Nicole." (Pet. ex. 8 at 12-13.) In August 2000, Ms. M. denied any parenting deficiencies during the intake at Family Services of Waterbury. (Tr. 6/5/01 at 140.)
Once she did have visits with Nicole, Ms. M. made extremely limited progress in establishing a parent-child relationship, additional proof that she was unable to benefit from even reunification services. (Tr. 6/6/01 at 55.) DCF provided supervised therapeutic visitation for over a year, although it rarely provides such a service to parents (tr. 6/5/01 at 67) and, if so. normally for only six months. (Tr. 6/6/01 at 13.) Yet Ms. M. failed to use such an opportunity to benefit from one-on-one professional guidance. (Tr. 6/5/01 at 146.) Claudia DellaBetta, the CT Page 7716 supervisor assigned to Ms. M.'s case, explained that Ms. M.'s inability to receive feedback prohibits her from providing effective parenting to Nicole. (Tr. 6/6/01 at 22.) Although Ms. M. had been attending for ten months at the time of Ms. DellaBetta's testimony, Ms. DellaBetta still could not endorse unsupervised visits. (Tr. 6/5/01 at 166.) The court found the opinion of Ms. DellaBetta credible that Ms. M., given her lack of insight and inability to receive feedback (tr. 6/5/01, pp. 163-166), would never make any progress in learning to parent Nicole (tr. 6/5/01, pp. 147-148; tr. 6/6/01, pp. 13, 22, 30-31) or be able in the future "to move into the role where she is the parent." (Tr. 6/6/01, p. 30-31.)
Perhaps the best evidence that, regardless of the efforts, Ms. M. was unable to benefit, is that her behavior has not changed. even during trial, a time when she should have been predominately focused on reunification with her daughter. In re Pascacio R., 52 Conn. App. 106, 113ff, 726 A.2d 114 (1999) (parent's courtroom demeanor appropriate factor in assessing rehabilitative status); see In re Joanna A., 2001 WE 821510, child protection session at Middletown (Levin, J, March 14, 2001) (noting parent's failure to appear at TPR trial); In re Shawn B., 2000 WL 1769491, Superior Court, child protection session at Middletown (November 2, 2000, Levin, J.) (courtroom conduct may be considered by trial court in reaching its decision). Instead, Ms. M. arrived to court late without explanation on June 6, 2001, and, on the afternoon of the last day of trial, when she had intended to take the witness stand, failed to return at all.
Dr. Sadler found that regardless of the services offered and her participation, Ms. M. did not make any progress in therapy toward being able to meet Nicole's parenting needs. (Tr. 4/2/01 at 129.) He concluded that Ms. M. had "no significant chance" of being able to parent Nicole. (Tr. 4/2/01, pp. 104, 106.) Dr. Sadler's conclusions, which the court finds credible, are were corroborated by the conclusions of Ms. M.'s therapist, Ms. Simeone, who told Dr. Sadler that Ms. M. had not made meaningful progress in therapy. (Tr. 4/2/01, pp. 13 1, 133). Indeed, when asked by counsel for Ms. M. whether Ms. M. successfully resolved her therapy issues, Ms. Simeone responded with the "faint praise" that Dr. Sadler described in his report. Simeone answered that Ms. M. resolved the issues "to the degree [she] was capable of resolving the many issues of her past." (Tr. 6/6/01 at 104.) Simeone outright acknowledged that Ms. M. simply did not have the level of insight necessary to resolve past issues. (Tr. 6/6/01 at 127.) The court finds this testimony from Dr. Sadler and Ms. Simeone to be credible and persuasive.
The court thus concludes that the evidence clearly and convincingly establishes that the respondent mother, Tammy M., despite the significant progress she has made toward establishing a stable life for herself, has CT Page 7717 repeatedly shown herself unwilling or unable to benefit from reunification services or undertake the work necessary for her to become a suitable parent for Nicole.
B. Statutory Grounds for Termination
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (j)(3).
1. Failure to Rehabilitate, § 17a-112 (j)(3)(B)
As grounds for terminating Ms. M.'s parental rights, DCF alleges that she has failed to rehabilitate herself pursuant to § 17a-112 (c)(3) (B), now § 17a-112 (j)(3)(B). That subsection of the TPR statute, as of the date of this decision, provides in relevant part as follows:
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the child . . . has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child.[16]
In conducting the inquiry whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider:
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child.
"The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in CT Page 7718 the child's life within a reasonable time." In re Shyliesh H.,56 Conn. App. 167, 173, 743 A.2d 165 (1999). "Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." (Id.)
The crux of the adjudicatory ground of failure to rehabilitate is whether a parent has sufficiently addressed the deficiencies in parenting that led to state intervention in the family so that the parent can, considering the age and needs of the child, assume a responsible position in the child's life, or will be able to do so within a reasonable time. As the Appellate Court noted in In re Sarah Ann K., 57 Conn. App. 441,448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." From the "historical perspective" in this case, the evidence and record establish that as of the date the TPR was filed, the adjudicatory date, and the time of trial, the respondent mother had not done so. Despite significant gains in many areas, including having developed the apparent ability to care for her two youngest children, the evidence overwhelmingly demonstrates, as discussed above, that Ms. M. had not developed the necessary insight into her own past, her responsibility for Nicole's past, and Nicole's present needs.
Section 17a-112 "requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child. . . ." (Internal quotation marks omitted.) In re Eden F., supra,250 Conn. 706. As discussed above, one of Nicole's critical needs is to have an insightful parent who will be able to help her deal with her past life of trauma, abuse, and disruption. The evidence establishes clearly and convincingly that Ms. M. does not have, and indeed will almost certainly never have, the ability to do so.
The failure to rehabilitate statute further requires the court to consider not only to look backward to determine whether a respondent had rehabilitated herself as of the adjudicatory date, but forward as well to assess whether the prospects for rehabilitation can be realized within a reasonable time. In the adjudicatory phase of a TPR trial, the court may ordinarily consider only evidence arising before the adjudicatory date. In assessing whether a TPR respondent is likely, within a reasonably foreseeable time, to achieve the level of personal rehabilitation necessary to parent her child, however, the court may also consider post-adjudicatory-date evidence. "It is axiomatic that the court can rely on factors occurring after the date of the filing of the petition to terminate parental rights when considering if additional time would promote rehabilitation. In re Sarah M., 19 Conn. App. 371, 377, 562 A.2d 566
(1989)." CT Page 7719
In re Amber B., 56 Conn. App. 776, 785, 746 a.2d 222 (2000).
 Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, we have determined that with regard to termination petitions brought under § 17a-112 (c)(3)(B), the trial court may, in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of that statute. In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time.
(Citation omitted; emphasis in original.) In re Latifa K.,67 Conn. App. 742, 748-749, 789 A.2d 1024 (2002).
From the evidence offered at trial, there is no reason to believe that Ms. M. will ever have the insight or ability to meet Nicole's needs. On this criterion, too, the court must consider this question in light of the child's age and needs. Here, the court must consider Nicole's ability to wait. The evidence clearly and convincingly establishes that the prospects for rehabilitation cannot be realized within a reasonable time given the age and needs of this child. As Dr. Sadler opined at trial, rehabilitation begins with an understanding of what went wrong and what needs to be different. (Tr. 4/2/01 at 102.) Christine Simeone concurred. (Tr. 6/6/01 at 134.) Despite several years of therapy, having been repeatedly advised that she needed to begin working on understanding her role in Nicole's history, Ms. M. has never acknowledged her responsibility, spent virtually no counseling time figuring out what had gone wrong or what changes she needed to make to parent Nicole. She has never come to appreciate what Dr. Sadler referred to as the "central and the most important . . . issue:"
that Nicole had been neglected multiple times. She's been removed, returned, removed, returned, and removed a third time. Ms. M. didn't seem to understand the significance of that. She didn't appear to understand her role in it. She did not take responsibility for beginning the awful course of Nicole's early CT Page 7720 development for the next number of years.
(Tr. 4/2/01 at 105.)
Ms. M.'s inability to receive or benefit adequately from feedback from the Waterbury Family Center staff shows her continuing inability to grow sufficiently in her ability to provide effective parenting to Nicole. In view of Nicole's age and needs, the child's need for stability, certainty, and permanency, this child cannot wait longer for her mother to gain the skills and insight needed to parent her. Waiting indefinitely for her mother's continued progress, in the fanciful hope that Ms. M. might some day achieve a breakthrough in her insight, would be "damaging to Nicole, the longer she stays in a foster home not knowing whether or how long she might stay there or what will happen if she leaves." (Id. at 144.) The court therefore finds, by clear and convincing evidence, that as of the filing of the TPR, the adjudicatory date, and the time of trial, Ms. M. had been provided specific steps for her to take to facilitate the return of the child to her[17] but had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Nicole's age and needs, she could assume a responsible position in Nicole's life.
 2. No Ongoing Parent-Child Relationship — § 17a-112 (j)(3)(D)
DCF also alleges no ongoing parent-child relationship between the respondent mother and daughter. This allegation invokes General Statutes § 17a-112 (j)(3)(D), which establishes a basis for terminating parental rights when
 there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
Under this section, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G., 53 Conn. App. 12,22, 740 A.2d 496 (1999).
"In considering whether an ongoing parent-child relationship exists, CT Page 7721 the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) In re John G., 56 Conn. App. 12,23, 740 A.2d 496 (1999). "Feelings for the natural parent connotes feelings of a positive nature only. . . . An ongoing parent-child relationship is one that develops as a result of a parent having met on a continuing day-to-day basis the physical, emotional, moral and educational needs of the child." (Citations omitted; internal quotations omitted.) In re Kezia M., 33 Conn. App. 12, 21, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).
The evidence is clear and convincing that as of the date that the TPR was filed, in May 2000, and the adjudicatory date of September 13, 2000, there was no parent-child relationship between the respondent mother and Nicole. When the TPR was filed, Nicole had not seen her mother since late 1994, almost six years earlier. She once told her therapist, Liz Bicio, that all she remembered about her mother was visiting in jail and that her mother had long hair. On the adjudicatory date of September 13, 2000, court-ordered visits with her mother had just resumed, and they had seen each other just four times for one and one-half hours each time. Those first few visits had been pleasant and amicable, and Nicole had enjoyed them. According to the visitation supervisor, Nicole "soaked up" her mother's attention, was curious and inquired about her past, but their relationship was more at a peer level than parent and child. At that point, with so little contact, and the respondent mother not having exercised a parental role in Nicole's life for many years, however, the court finds by clear and convincing evidence that there was no "parent-child" relationship between them.
The court must also consider, under the second prong of the no-ongoing statute, "whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship." "To satisfy the second prong [of the analysis], the trial court [is] required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. . . . The `best interest' standard, therefore. does not become relevant until after it has been determined that no ongoing parent-child relationship exists." (Citation omitted.) In re Kezia M.,33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in the best interest of a child to permit further time for a relationship with his parent to develop include "(1) the length of stay with the foster parents, (2) the nature of the child's relationship with the foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of the child's relationship to his or her natural parent." (Id.) CT Page 7722
In assessing these factors in the context of the overall evidence, the court notes that Nicole has lived with her present foster mother for more than four years. She has bonded with and regards Ms. Z. as her psychological parent. Ms. Z. has done a remarkable job in helping this young child adjust to her difficult past. Nicole has gone from a timid, fragile, and worried child to one who has adjusted to her environment, is thriving in the foster home, doing well socially and academically, and overcome most of the psychological trauma she had suffered in her early life. Her relationship with Ms. M., after almost a year of 90-minute weekly visits, has not ripened into a parent-child relationship, but is still primarily a visiting relationship that both look forward to. The respondent's failure to reestablish a parent-child relationship with Nicole during the visitation and intensive supportive services of the last year suggests that any wait for such a relationship to arise will necessarily be for an indeterminate period. Yet just as waiting indefinitely for Ms. M. to gain insight would damage Nicole, particularly because of this child's strong need for certainty, stability, and permanence. so too would waiting indefinitely for a parent-child relationship to develop be detrimental to her.
The court finds the testimony and opinion of Beth James, a licensed social worker retained by DCF to meet regularly with and befriend Nicole, particularly persuasive on this issue. Ms. James meets and talks regularly with Nicole, at least once a month. After the visits between mother and daughter began, Ms. James and Nicole at first discussed Ms. M. almost every time they talked. Ms. James noted that for the first few months of the visits, Nicole seemed curious and interested in her mother; but by the end of 2000, when the visits had been going on for a few months, Nicole stopped talking about the visits and was more occupied with the affairs of her day to day life in her foster home. "She talks more frequently now about her future and when she does that she talks about it being as part of the current household and family that she's in." (Test. James, tr. 6/6/01 at 46.) The court finds credible the opinion testimony of Ms. James that waiting a longer time for a parent-child relationship to develop between Ms. M. and Nicole would only confuse Nicole, since she now considers April Z. her mother. To remove Ms. Z. from that role would cause Nicole great anguish:
 Q. If Nicole were removed from April's care, what affect [sic] do you think that would have on Nicole?
A. I think that would break her heart. I think she would be very upset and confused form the separation from April as well as the rest of the family, the CT Page 7723 community, the school, her friends. I think she would probably have some serious behavioral outbursts because of it. I think it would disrupt her life.
(Id. at 59.)
In view of the above, Nicole's need for stability and permanence, and the harm to Nicole from waiting indefinitely for such a relationship to develop, the court thus finds, by clear and convincing evidence, based on the totality of the evidence, that there is no ongoing parent-child relationship between Nicole and Ms. M. and that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
 IV — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase.[18] In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112 (k). In re Tabitha P., 39 Conn. App. 353,664 A.2d 1168 (1995).
A. Required Statutory Findings
The court makes the following written findings, as required by General Statutes § 17a-112 (k). The court has considered these factors and its findings in determining whether it is the best interest of the child to terminate the parental rights of each respondent. In re Quanitra M.,60 Conn. App. 96, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909
(2000).
 (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1).
Before her incarceration DCF offered the respondent numerous services to help her keep custody of Nicole; these included referral to an CT Page 7724 intensive family reunification program that would have provided in-home parenting training and supervision; referrals for food, income, counseling, and shelter; and case management services. After Ms. M.'s release from prison, DCF again offered case management services. Since Ms. M. had sought therapy on her own to improve her parenting skills, DCF did not provide counseling or parenting services. Although DCF told both the respondent and her attorney that the respondent needed to work in therapy on developing insight into, and a sense of responsibility for, Nicole's history and needs, DCF did not inform either of Ms. M's therapists of the Department's concerns; nor did DCF itself provide counseling services aimed at helping the respondent address these concerns.
 (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2)
For the reasons stated above, the court finds that DCF did not make reasonable efforts to reunite the family because it failed to ensure that the respondent mother received therapy aimed at addressing DCF's concerns about her lack of insight. Yet the respondent herself was unable or unwilling to benefit from insight-oriented therapy, and thus such counseling would have been futile.
 (3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3).
On July 7, 1998, the court, Swienton, J., entered an order of expectations that it expected the following conduct from Ms. M.:
• Keep all appointments set by or with DCF. The respondent did not always comply with this expectation. She missed certain appointments set up for home visits by DCF social workers and occasionally (although not excessively or unreasonably) missed appointments to visit Nicole.
• Keep whereabouts known to DCF or your attorney. There is no evidence that Ms. M. failed to comply with this expectation.
• Visit the child(ren) as often as DCF permits. The respondent mother complied with this expectation, except for a few missed visits. CT Page 7725
• Participate in parenting, individual, and drug and alcoholcounseling. Although Ms. M. participated in applicable counseling, she did not meet DCF's stated expectation that she would work on developing insight into Nicole's history or needs.
• Participate in random urines and hair analysis testing uponrequest by DCF. There is no evidence that DCF made such requests, and DCF social workers testified at trial that drug or alcohol abuse were not concerns.
• Secure and maintain adequate housing and income. Ms. M. complied with this expectation.
• Sign releases for DCF and Juvenile Court Use. M0s. M. complied with this expectation.
• No substance abuse. Ms. M. complied with this expectation.
• No involvement with the criminal justice system. Ms. M. complied with this expectation.
• Cooperate with the Department of Adult Probation. There is no evidence Ms. M. failed to comply with this expectation.
 (4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k) (4).
Nicole is closely bonded to her foster mother and foster siblings. She regards the foster mother as her mother and psychological parent. She has no parent-child relationship with her biological mother, the respondent Tammy M., but does feel affection for Ms. M. and enjoys seeing her.
 (5) The age of the child — § 17a-112 (k) (5).
Nicole is ten years old.
(6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but notCT Page 7726 limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6)
The respondent took many steps to improve her conduct and "adjust her circumstances."
She went into therapy, entered what appears to be a stable intimate relationship, maintained a steady job, and is apparently adequately parenting two younger children. In her therapy she worked on developing impulse control, improving her self-esteem, preventing a recurrence of lawless behavior that might lead to further imprisonment, and improving her parenting skills. In so doing, she has apparently become able to live a law-abiding, stable life in a home environment suitable for rearing children. Since her release from incarceration in the mid-1990s. Ms. M. made repeated and persistent efforts to begin seeing her child. Yet Ms. M. has not made the necessary efforts to gain the necessary insight into Nicole's needs or history that would be necessary for her to meet this child's need.
 (7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7)
No unreasonable act of any other person has prevented Ms. M. from maintaining a meaningful relationship with Nicole. Economic circumstances did not affect that relationship.
B. Best Interest of the Child — § 17a-112 (j)(2)
The final element of the termination of parental rights statute, §17a-112 (j), requires that the court find, "by clear and convincing evidence . . . (2) that termination is in the best interest of the child. . . ." In determining whether terminating the respondents' parental rights would be in the best interest of the minor child here, the court has considered various factors, including Nicole's interest "in sustained growth, development, well-being, and in the continuity and stability of [her] environment"; Capetta v. Capetta, 196 Conn. 10, 16, CT Page 7727490 A.2d 996 (1985); her specific needs; the length and nature of her stay in foster care; the nature of her relationship with her biological and foster parents; the limited contact maintained with the biological parents and the potential benefit or detriment of her retaining a connection with her biological parents; her genetic bond to each parent,In re Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484 (1999); and the seven statutory factors. The best interest standard is inherently flexible and fact-specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare.
For all the reasons set forth above, the court finds by clear and convincing evidence that terminating the parental rights of Ms. Tammy M. and Mr. George J. is in the best interest of the minor child, Nicole. As for her father, he has consented to termination of his parental rights in recognition that he could not meet her needs. As for Ms. M., despite her repeated efforts to see this child, and her many significant improvements in conduct, lifestyle, and parenting skills, she has never undertaken the work necessary to meet Nicole's needs, to understand or address her responsibility for Nicole's history of neglect and abuse, or to gain insight into Nicole's needs or history. Nicole needs a parent who can help this young child understand, deal with, and grow through this history. Despite Tammy M.'s persistent desire for reunification with Nicole, Ms. M. lacks the capacity or will to develop such insight. Nicole's best interest is served by terminating the parental rights of both respondents.
 V — ORDERS
Having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist to terminate the parental rights of Tammy M. and George J. to their minor child Nicole, and having determined, upon all of the facts and circumstances presented, that it is in Nicole's best interest to terminate the parental rights of her biological parents, the court accordingly enters the following ORDERS:
The court hereby TERMINATES the parental rights of Tammy M. and George J. to their minor child Nicole.
The court APPOINTS the Commissioner of the Department of Children and Families as Nicole's statutory parent for the purpose of securing an adoptive family or other permanent placement for her. In view of the length of time that Nicole has been placed with her present foster parent, her bonding with her foster mother, and the foster mother's stated willingness to adopt Nicole, the court DIRECTS the Commissioner to give first preference to the current foster mother for adopting Nicole. CT Page 7728
Within thirty days of this judgment, the Commissioner SHALL SUBMIT a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
 ___________________ STEPHEN Z. FRAZZINI JUDGE OF THE SUPERIOR COURT